# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2004 Session

## STATE OF TENNESSEE v. DARIUS JONES

**Appeal from the Criminal Court for Shelby County**
**No. 01-04380-92      John P. Colton, Jr., Judge**

---

### No. W2003-02225-CCA-R3-CD  - Filed December 15, 2004

---

The defendant, Darius Jones, was convicted of one count of felony murder, four counts of aggravated robbery, three counts of attempted especially aggravated robbery, two counts of attempted aggravated robbery, and one count of aggravated burglary.  The trial court ordered consecutive sentences of life with the possibility of parole for the felony murder, ten years for each of the aggravated robberies and attempted especially aggravated robberies, and four years for each of the attempted aggravated robberies and the aggravated burglary, for an effective sentence of life plus eighty-one years.[1]  In this appeal of right, the defendant argues that the evidence was insufficient, that the trial court erred by admitting photographs of the crime scene, that the trial court erred by limiting the defense cross-examination of a homicide detective, that the trial court erred by admitting the videotaped preliminary hearing testimony of one of the victims, that the trial court erred in its instructions to the jury, that the sentence was excessive, and that cumulative error requires reversal. The conviction for felony murder and sentence of life with the possibility of parole are affirmed.  The remaining judgments of conviction are affirmed, but the causes are remanded for resentencing.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed in Part, Remanded in Part

GARY R. WADE, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Larry Copeland (at trial), Paul Guibao (at trial), and Michael E. Scholl (on appeal and at trial), Memphis, Tennessee, for the appellant, Darius Jones.

---

[1]The judgment for each offense on which the defendant received a ten-year sentence erroneously reflects a sentence of eight years.  The transcript of the sentencing hearing reflects that ten-year sentences were imposed.  "[W]hen there is a conflict between the judgment of conviction and the transcript of the proceedings, the transcript controls."  Ronald W. Rice v. David Mills, Warden, No. E2003-00328-CCA-R3-PC, slip op. at ____ (Tenn. Crim. App., at Knoxville, Aug. 19, 2003).  That the sentences are ten years for each offense is not, however, in dispute.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; and Karen Cook-Twele, Mike Davis, and Tom Hoover, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On the night of September 29, 2000, Enrique Diaz Castillo and some friends were playing a card game at the apartment of Jose Gomez at Marina Cove in Memphis when two masked black males entered the front door and demanded money. Castillo, who required an interpreter at trial, was in the living room with three other men, Pablo Alvarado, Armando Becerra, and Hector Moreno. The taller of the two robbers,[2] who carried a black revolver, took the money from the men's card table and demanded more. According to Castillo, when Moreno and Alvarado answered that they had no money, the taller robber shot Moreno in the arm and Alvarado in the leg. The taller robber took $400 from Castillo and walked to the kitchen, where he demanded money from Gomez, Alfonso Enrique Becerra, and Hector Martinez Hernandez. On his way out of the apartment, the taller robber shot Armando Becerra in the chest, causing his death.

Hector Moreno, who also testified at trial through an interpreter, corroborated much of Castillo's testimony. Moreno, who collected the gambling proceeds from the table and handed them to the robbers, was reaching for his wallet when the taller man shot him in the arm with a black revolver. He remembered that Castillo had handed the robbers some $400 and that Alvarado was shot in the leg when he was unable to produce any money of his own. Moreno related that the taller of his assailants then robbed the men in the kitchen. It was his recollection that the taller robber shot Armando Becerra, who was seated on the couch, as he left.

Because Carlos Diaz Ponce was unavailable for trial, a videotape of his testimony at the preliminary hearing was used as evidence. Through an interpreter, he had testified that on the evening of the offense, he was in the kitchen of the Gomez residence drinking tequila with Jose Jesus Romero Ponce, Hector Martinez Hernandez, Jose Gomez, and Alfonso Enrique Becerra when he saw a man with a gun in the living room. Ponce recalled that he immediately alerted his companions and hid his wallet in the trash. He testified that he heard two gunshots before the gunman entered the kitchen and demanded money. Ponce, who saw only one of the two robbers, heard a third gunshot as his assailant left the apartment.

Dr. Teresa Campbell performed the autopsy on Armando Becerra. She concluded that his death was caused by a gunshot wound to the left lower chest.

Memphis Police Department Patrol Officer Adrienne Dobbins, the first to arrive at the scene, determined that two black males with guns had committed the robbery. One victim had been shot

---

[2]Although the state's witnesses distinguish between the two robbers by height, there is no information in the record regarding the height of the defendant or Spencer Peterson, who was also charged in the crime. The record does not contain any information as to Peterson, who was tried separately.

in the arm, another in the leg, and a third in the chest. The officer found a quart-sized Busch beer bottle directly outside the apartment door.

Officer Ricky Davison of the Crime Response Unit gathered evidence and documented the scene, arriving at approximately 9:08 p.m. on the night of the offense. He collected the Busch beer bottle from outside the apartment door and took it to the laboratory for latent fingerprint processing. Officer Kevin Shaver processed the bottle and was able to recover "six cards" of prints, none of which assisted officers in the investigation.

Lemmie Wells, a neighbor of Jose Gomez at the Marina Cove apartments, was aware that the defendant had lost his job and needed to make some "quick money." On the day of the offense, Wells overheard the defendant say that he intended "to rob some Mexicans." He recalled that a man known as "Twin" handed the defendant a .22 long-barreled revolver. Wells, who discouraged the defendant from proceeding with his plan, was at a store near the apartments when he heard gunshots. When he returned to the apartment complex, he saw the defendant and Spencer Peterson running away. Wells recalled that the defendant later admitted that he had shot three Mexicans, throwing the weapon in "the lake," and disposing of his clothing under some bushes near a swimming pool. While acknowledging during cross-examination that he was the initial suspect identified by police, Wells maintained that he was not involved in the offense.

Dewayne Dickerson, who also lived in the Marina Cove apartments, remembered that on the date of the offense, the defendant had said that he "needed some money that night." When called as a state witness at trial, however, Dickerson denied having told police that he had overheard the defendant make other incriminatory remarks, even though he had signed a statement to police.

Sergeant Michael Caudill then testified that he had interviewed Dewayne Dickerson prior to trial and that Dickerson had made the following statement:

> We were standing at the green box and [the defendant] and Spencer walked down to the other end of the apartments just past the entrance. About four minutes later, they came back wearing ski masks, and when they got to the green [electrical transformer] box, they started to put their ski masks on. The owner of Z Market came out of the store and was looking at us so they took them back off.
> [The defendant] pulled out some gold bullets that were in a paper sack in his pocket. Four Mexicans came towards the dark cut. The [the defendant] said to Spencer we're fixing to go make us some money. Then [the defendant] pulled out a black revolver with a long barrel and a black handle, and they put the ski masks on as they was walking towards the Mexicans. The Mexicans walked in the dark cut and [the defendant] and Spencer followed them.

Sergeant J. C. Burton, a homicide investigator with the Memphis Police Department, interviewed the defendant. After waiving his rights, the defendant admitted participation in the robberies:

-3-

Before, I bought an eight ball of cocaine and did it all. Then I bought some gin from the [l]iquor store on Winchester and Mendenhall. Then I bought a quarter ounce of weed and three bottles of Busch Beer. We drank all the beer and then me and Spencer [Peterson] went around looking for someone to rob, mainly dope folks. We saw the door cracked to the Mexicans['] apartment and pulled down our masks. Spencer went in the house with the gun and I came in behind him and got the money from off the table. Then the Mexican[]s and Spencer started tussling over the gun and then the other Mexican started coming out of the kitchen. I ran out of the house and then [three] shots were fired and then we separated. I went and bought another eight ball. I snorted some and put some in some weed.

The defendant told the officers that he had been wearing black jeans, a gray shirt, and a black mask with a screen that covered his face. He described the gun as a "rusty black .22 revolver with a long barrel."

Christopher Heard, who lived down the street from the Marina Cove apartment complex, testified on behalf of the defense. He claimed that just prior to the shootings, he was "hanging out on the green box," smoking marijuana with the defendant, Peterson, and another man known as "A.T.L." Heard maintained that he saw no ski masks or weapons during that time. He contended that there was no more than five minutes between the time that he left the two men and when he heard the sirens of the emergency vehicles responding to the shootings.

I

Initially, the defendant contends that the evidence was insufficient to support any of his convictions. The state disagrees.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

In addition to the felony murder and aggravated burglary, the defendant was convicted of four counts of aggravated robbery, three counts of attempted especially aggravated robbery, and two counts of attempted aggravated robbery. Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Robbery becomes aggravated where it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-402(a). Especially aggravated robbery occurs where both a deadly weapon is used and the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a). "Serious bodily injury" means bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34).

A person commits criminal attempt when, acting with the kind of culpability otherwise required for the offense, he:

(1) [i]ntentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
(2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

Generally, the evidence at trial established that two black men wearing masks entered the Gomez apartment without permission and that the taller of the two, who was brandishing a black revolver, demanded money from those victims in both the living room and the kitchen. Two of the victims were shot, one fatally. The defendant, a black male, admitted his involvement to the police. He explained that he had consumed cocaine, marijuana, liquor, and beer before he and a man named Spencer Peterson had "look[ed] for someone to rob" and found the door to the Gomez apartment open. An empty quart-sized bottle of Busch beer, the brand the defendant claimed to have drunk that night, was found behind a post directly outside the Gomez apartment. Lemmie Wells confirmed that just before the shootings, the defendant, armed with a revolver, expressed his intent to "rob some Mexicans" for some "quick money." The defendant later admitted to Wells that he had shot three Mexicans and then disposed of his weapon and clothing.

The defendant was convicted of the aggravated robbery of Alfonso Enrique Becerra, Enrique Diaz Castillo, Jose Jesus Romero Ponce, and Jose Gomez. Enrique Diaz Castillo testified that the

-5-

armed robbers took approximately $400 from him. Hector Moreno corroborated his testimony. While the defendant argues that the state failed to prove that the victims in the kitchen were actually robbed, Carlos Diaz Ponce affirmatively testified that all of the other victims in the kitchen gave their money to the armed robber. While Carlos Diaz Ponce had hidden his wallet in the garbage can, he confirmed that the other men placed their money on the counter or table as the robber had instructed. The evidence was sufficient, therefore, to support the four convictions for aggravated robbery.

The defendant was also convicted of the attempted aggravated robbery of Hector Martinez Hernandez and Carlos Diaz Ponce. Castillo and Ponce both testified that Hernandez was in the kitchen when the taller robber demanded money from the men in that room. Ponce testified that he personally witnessed the taller man attempt to rob every man in the kitchen. Ponce explained that he was spared only because he had hidden his wallet in the garbage can. There was sufficient evidence, therefore, for a jury to find that the defendant attempted to rob Hernandez and Ponce with a deadly weapon.

The defendant was also convicted of the attempted especially aggravated robbery of Pablo Alvarado, Hector Moreno, and Armando Becerra. Castillo testified that the taller robber took the money in the "pot" and then demanded money from each of the men in the living room. Alvarado, Moreno, and Becerra were among those in the living room. Castillo further testified that when none of the three men were able to produce any additional money, the taller robber shot Alvarado in the leg, Moreno in the arm, and Becerra in the chest. In our view, the evidence was sufficient to support the attempted especially aggravated robbery convictions.

Burglary is defined by our Code as follows:

> A person commits burglary who, without the effective consent of the property owner:
> (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;
> *    *    *
> (3) Enters a building and commits or attempts to commit a felony, theft or assault . . . .

Tenn. Code Ann. § 39-14-402(a)(1) – (3). Aggravated burglary is burglary of a habitation. Tenn. Code Ann. § 39-14-403(a). Habitation "[m]eans any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." Tenn. Code Ann. § 39-14-401(1)(A).

Although Jose Gomez was not a witness at the trial, Castillo, Moreno, and Ponce identified the Marina Cove apartment where the offense occurred as Gomez's residence. Castillo and Moreno, who were both in the living room when the robbers entered the front door, testified that no one had consented to the entry. There was testimony that the men did not knock or provide any other

warning: "They push out the door and they ask for money." In our view, this evidence was sufficient to establish that the defendant entered a habitation, the Gomez apartment, with the intent to commit a felony. Thus, the evidence was sufficient to support the conviction for aggravated burglary.

Finally, the defendant was also convicted of the first degree felony murder of Armando Becerra. The offense is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). There was proof that the defendant shot and killed Armando Becerra during the course of committing no fewer than four aggravated robberies and an aggravated burglary. Although the defendant complains that the killing was "separate and distinct from any robbery," he cites no authority or facts to support his position. In considering whether the evidence was sufficient to support a conviction of first degree murder in the perpetration of theft, a reviewing court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action. State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). "[I]t is not required that the felony be committed contemporaneously with the murder." State v. Morris, 24 S.W.3d 788, 799 (Tenn. 2000). In this case, the killing of Armando Becerra was inextricably connected to the aggravated robberies and the aggravated burglary. There was no break in the chain of events. As such, the evidence was more than sufficient to support the defendant's conviction for murder during the perpetration of a felony.

II

Citing Tennessee Rule of Evidence 403, the defendant next contends that the trial court erred by admitting an excessive number of crime scene photographs. The state argues otherwise.

The admissibility of photographs is discretionary with the trial court. A ruling will not be disturbed on appeal absent a clear abuse of discretion. State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). In order to be admissible, photographs must be relevant, and their probative value must not substantially outweigh any danger of unfair prejudice. Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. Autopsy photos should be particularly scrutinized because "they present an even more horrifying sight and show the body in an altered condition." Id.

The record includes a total of nine photographs of the scene:

| Exhibit | Witness | Contents |
|---------|---------|----------|
| 1 | Dobbins | close-up of blood droplets on living room carpet marked "item 2" |
| 2 | Dobbins | view of living room floor from interior |
| 3 | Dobbins | Busch beer bottle outside apartment |

| 9 | Davison | overhead view of blood droplets on living room carpet marked "item 2" |
| 10 | Davison | close-up of blood droplets on living room carpet marked "item 3" |
| 11 | Davison | close-up of blood droplets on living room carpet marked "item 2" |
| 12 | Davison | close-up of bullet fragment on living room carpet marked "item 1" |
| 13 | Davison | view of living room from front doorway |
| 14 | Davison | Busch beer bottle outside apartment |

The record indicates that defense counsel objected only to the photographs introduced through officer Davison, contending that they were cumulative. The trial court indicated partial agreement with defense counsel but determined that any duplication was not unfairly prejudicial. Although Exhibits 1 and 11 are almost identical, the remainder of the photos vary by subject matter and angle, providing the jury with different views of the evidence and the scene. The blood droplets on the living room carpet would have been particularly relevant evidence in light of the defendant's claim to officers that the shootings occurred during a "tussle" over the gun. Moreover, unlike many crime scene photographs, these were not particularly graphic in nature. In our view, the trial court acted within its discretionary authority by admitting the photographs.

III

The defendant next asserts that the trial court erred by prohibiting him from cross-examining Sergeant Burton regarding other home invasion robberies in Memphis near the time of the offense in this case. The state contends that the trial court properly excluded the evidence as irrelevant and that the defendant was not prejudiced by the limitation.

Denial of the right to effectively cross-examine is "'constitutional error of the first magnitude'" and amounts to the denial of a basic right essential to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308 (1974)). While the right is fundamental, the propriety, scope, and control of cross-examination is left to the sound discretion of the trial judge. Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts cannot interfere with the exercise of that discretion absent a clear and plain abuse. See State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460, 464 (1963); Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948).

During cross-examination, Sergeant Burton testified that "pretty much every one in [the homicide] section assisted in this case." When asked why, she responded, "Because we help each other. If there's something to do, we assist each other. . . ." Defense counsel then asked, "Would that be in any relation to the problem that was happening down there in South Memphis at that time with all the home invasion robberies?" At a jury-out hearing on an objection to the question, defense counsel asserted that he intended to show that Sergeant Burton was under "extreme pressure" to

solve a string of home invasion robberies. A voir dire of the sergeant, however, indicated that she had no recollection of any other home invasion robberies being investigated at the time of the offense or of any pressure from "on high." The trial court, after concluding that the testimony was irrelevant, prohibited the questioning.

In his brief, the defendant contends that the cross-examination should have been permitted because "[p]ressure within the homicide unit to close cases in this particular area of town goes directly to the credibility of the officers and possibly creates a motive for the police to force a confession or fabricate evidence." Any pressure on the investigating officers to quickly solve this particular offense quickly may have been relevant to show bias or prejudice on the part of the police. See Tenn. R. Evid. 616. Nevertheless, the defendant has failed to demonstrate how evidence of other, unrelated home robberies would have been relevant. See Tenn. R. Evid. 401, 403. Likewise, the defendant has failed to establish how he was prejudiced by the trial court's ruling. The defendant's examination of Sergeant Burton outside the presence of the jury did not suggest any particular "pressure" on the police to solve the crime. In our view, the trial court did not abuse its discretion by disallowing questioning about the other home invasion robberies.

IV

The defendant contends that the trial court erred by admitting the videotaped preliminary hearing testimony of Carlos Diaz Ponce. The state argues that the videotape was properly presented to the jury.

Under Tennessee Rule of Evidence 804, former testimony by a declarant who is "unavailable" as a witness at trial is not excluded by the hearsay rule. Tenn. R. Evid. 804(b)(1). Former testimony is defined as follows:

> Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Id. The Advisory Commission Comment specifically notes that the rule permits preliminary hearing testimony. Id., Advisory Commission Comment. This court has previously stated that "a preliminary hearing transcript is precisely the type of former testimony contemplated under the rule." State v. Michael Dwayne Hatfield, et al., Nos. 03C01-9307-CR-00233, et al., slip op. at 8 (Tenn. Crim. App., at Knoxville, March 29, 1994), perm. app. denied (Tenn. 1994).

The defendant stipulated that Ponce was unavailable for trial. He contends that the trial court committed error by admitting the videotaped testimony because his cross-examination of Ponce at the preliminary hearing was cut short by the general sessions court. The defendant also claims that the evidence should have been excluded for three reasons: (1) because he did not have a "similar

motive" under the terms of the rule to develop Ponce's testimony at the preliminary hearing; (2) because he was represented by different counsel at the preliminary hearing; and (3) because he did not have an opportunity to challenge the translation of Ponce's written statement to police.

In our view, the trial court did not abuse its discretion by admitting the preliminary hearing testimony of Carlos Diaz Ponce. See State v. Monquez L. Summers, No. M2003-00379-CCA-R3-CD (Tenn. Crim. App., at Nashville, Sept. 15, 2004) (finding no error in the admission of 804(b)(1) former testimony under an abuse of discretion standard). Our review of the videotaped testimony indicates that the direct examination of Ponce, who saw only one robber and could not make an identification, was brief. On the other hand, the cross-examination by the defense was more lengthy and focused on Ponce's limited knowledge of the circumstances of the offense. Further, there is no requirement that there be continuity of counsel for the party against whom former testimony is offered under Rule 804(b)(1). Finally, the tape establishes that the preliminary hearing judge did not prevent the defendant from developing Ponce's testimony on cross-examination. After permitting defense counsel to question Ponce at length regarding the circumstances of the statement and his contradiction thereof, the judge simply asked defense counsel to "move on," suggesting that a recess might be necessary because of other cases on the docket. Defense counsel received permission for an additional question and then announced that the cross-examination had been completed. Otherwise, the defendant received an extended, unhampered opportunity to cross-examine Ponce. Under these circumstances, it was not error to admit the preliminary hearing testimony of Carlos Diaz Ponce.

V

The defendant next argues that the trial court erred in various of its instructions to the jury. The state contends that the issues have been waived.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury, which dictates that all issues of fact be tried and determined by twelve jurors. U.S. Const. amend VI; Tenn. Const. art. 1, § 6; see State v. Bobo, 814 S.W.2d 353, 356 (Tenn. 1991); Willard v. State, 174 Tenn. 642, 130 S.W.2d 99 (1939). This right encompasses the defendant's right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30.

The defense brief cites four alleged errors by the trial court in its instructions to the jury, quoted verbatim as follows:

1)    the inclusion of the illegal charge of criminal attempt homicide[;]
2)    the definition of murder during the perpetration of a felony[;]
3)    the victims' names in the indictments were wrong[; and]
4)    the verdict form was incorrect.

The defendant argues that "[a]lthough these errors were eventually corrected, the number of mistakes and the cumulative nature of the mistakes could only cause widespread confusion for the jury."

With regard to the first claim, the record reflects that the defendant was charged with, but acquitted by the jury of, the attempted premeditated killings of Hector Moreno and Pablo Alvarado. These victims were shot in the arm and leg, respectively. The transcript of the trial court's instructions to the jury reflects that the trial court instructed the jury that attempted reckless homicide, which is not an offense, was a lesser included offense of those charges. See State v. Vernon Lamar Bryant, No. E2002-01234-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Oct. 21, 2003). During a recess, the state pointed out the possible error and the trial court agreed. At the conclusion of the short hearing, which included other matters, the trial court stated, "We'll try and straighten that out, lawyers, and I think the rest of it [will] straighten itself out on the verdict part . . . ."

The record is silent as to any curative measures that the trial court may have undertaken. Nevertheless, the defendant concedes that the error was corrected. The jury was not charged on the elements of attempted reckless homicide and no further reference to the non-existent offense was made. Most importantly, the defendant was actually acquitted by the jury of the attempted premeditated murder charges. An acquittal on a greater charge serves as an acquittal on all lesser included offenses. See generally Ray v. State, 563 S.W.2d 218, 220 (Tenn. Crim. App. 1977). Because no convictions at all resulted from those counts in the indictment, any error was harmless beyond a reasonable doubt.

The defendant also contends that the instruction on felony murder was incorrect, that the names of the victims included in the indictments were erroneous, and that the verdict form was incorrect. He does not, however, provide this court with any guidance as to the nature of the alleged errors, with citations to the record, or with specific authority supportive of his claims. The state, asserting that these arguments have been waived, contends that it is unable to respond because it is unable to find the alleged errors in the record.

The defendant has provided this court with little more than conclusory allegations. The record does not contain any verdict forms. Any errors in the names of the victims are not apparent. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived by the court." Tenn. Ct. Crim. App. R. 10(b). The record does reflect that the trial court's instructions to the jury were lengthy, but not unusually so given the number of charges against the defendant. There is no indication in the transcript of any apparent error as to the felony murder instructions. Under these circumstances, this issue does not entitle the defendant to relief.

VI

Next, the defendant contends that all of his sentences, except for the felony murder sentence, were excessive and that the trial court erred by ordering consecutive service. The state argues otherwise.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

No testimony was presented at the sentencing hearing. After hearing the arguments of counsel, the trial court found the following enhancement factors to be applicable to each of the defendant's convictions:

(2)  the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
(3)  the defendant was a leader in the commission of an offense involving two or more criminal actors;
(4)  the offense involved more than one victim;
(9)  the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
(19)  a victim, under § 39-15-402 (aggravated child abuse and neglect), suffered permanent impairment of either physical or mental functions as a result of the abuse inflicted;
(21)  the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult; and
(23)  the defendant intentionally selected the victims in whole or in part because of race.

See Tenn. Code Ann. § 40-35-114(2), (3), (4), (9), (19), (21), (23). The trial court declined to consider the defendant's youth as a mitigating factor because of his juvenile record.

When this appeal was first initiated, the defendant challenged only the application of enhancement factors (7), which was not actually applied by the trial court, and (9). In a supplemental brief filed after the United States Supreme Court's decision in <u>Blakely v. Washington</u>, 542 U.S. __, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the defendant argued that none of the enhancement factors would apply.

<u>Blakely v. Washington</u> calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. <u>Id.</u> The Court observed that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>." <u>Id.</u> at 2537. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." <u>Id.</u> at 2543.

In our view, the decision in <u>Blakely</u>, coupled with the state of the record, requires that each of the defendant's sentences, except that imposed for felony murder, be vacated and that the causes be remanded for resentencing. Notwithstanding the ruling in <u>Blakely</u>, the trial court failed to make adequate findings as to the potential enhancement factors. No information regarding any relative weight or value assigned thereto is contained in the record. Additionally, while the trial court considered the presentence report, it is not in the record. Because this was not an aggravated child abuse or neglect case, enhancement factor (19) could not have been applied pre-<u>Blakely</u>. Under these circumstances, these causes should be remanded to the trial court for resentencing in conformity with the Supreme Court's decision in <u>Blakely</u>. Enhancement factor (2) may properly be applied to each of the defendant's convictions if he possesses the requisite criminal history. Otherwise, additional enhancement factors may be applied based "solely on the basis of facts reflected in the jury verdict or admitted by the defendant." <u>Id.</u> at 2537.

The defendant also contends that the trial court erred by ordering consecutive service of his sentences. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in <u>Gray v. State</u>, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in <u>State v. Taylor</u>, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230.  The Sentencing Commission Comments adopted the cautionary language.  Tenn. Code Ann. § 40-35-115.  The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[3] exist:

> (1)  The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2)  The defendant is an offender whose record of criminal activity is extensive;
> (3)  The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4)  The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5)  The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6)  The defendant is sentenced for an offense committed while on probation;
> (7)  The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present:  (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses.  In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct."  The Wilkerson decision,

---

[3]The first four criteria are found in Gray.  A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion.  See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Wilkerson, 905 S.W.2d at 938.

In this case, the record indicates that the trial court determined the defendant to be a dangerous offender. The additional findings required for that classification are not, however, included in the transcript. This court cannot properly review the issue further without the presentence report. Upon remand, the trial court should revisit the issue of consecutive sentencing, placing its specific findings on the record. See State v. Gregory Robinson, 146 S.W.3d 469, No. W2001-01299-SC-R11-DD, slip op. at 26 n.14 (Tenn. Sept. 28, 2004) (noting that several courts have rejected the applicability of Apprendi and Blakely to the consecutive sentencing determination).

## VII

Finally, the defendant asserts that he should be granted a new trial on the basis of cumulative error. Because the trial was properly conducted, the defendant is not entitled to relief on the basis of cumulative error.

Accordingly, the defendant's conviction for felony murder and his sentence of life imprisonment with the possibility of parole are affirmed. The defendant's convictions for aggravated robbery, attempted especially aggravated robbery, attempted aggravated robbery, and aggravated burglary are also affirmed, but the causes are remanded for resentencing in accordance with this opinion.

_____
GARY R. WADE, PRESIDING JUDGE